# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1419-19T6

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

C.M.W.,

     Defendant-Respondent.

_____

Argued December 17, 2019 – Decided January 10, 2020

Before Judges Fisher, Gilson and Rose.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Complaint No. W-2019-000965-1506.

William Kyle Meighan, Senior Assistant Prosecutor, argued the cause for appellant (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the brief).

Francis Robert Hodgson, III, argued the cause for respondent.

PER CURIAM

We granted leave to consider the State's interlocutory appeal of an order denying pretrial detention of a defendant charged with first-degree murder. We conclude the trial judge abused his discretion in finding defendant rebutted the presumption in favor of detention. Even if it could be said on this record that the presumption was rebutted, the State provided clear and convincing evidence that detention was required notwithstanding. Consequently, we reverse the order under review.

The record contains, as the judge found, "sufficient evidence to charge defendant" and to conclude the presence of probable cause that defendant "is responsible for stabbing the victim with a knife" in the early afternoon of September 29, 2019. Late the following afternoon, defendant turned herself in, in the company of her attorneys. She was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1), third-degree unlawful possession of a weapon (a knife), N.J.S.A. 2C:39-5(d), and third-degree possession of a weapon (a knife) for an unlawful purpose, N.J.S.A. 2C:39-4(d).

On October 1, 2019, the State moved for pretrial detention and, after a few brief adjournments, the hearing commenced on October 17, 2019. When the defense offered what the judge referred to as a "substantial submission" of evidence, he provided the State with a one-day continuance to submit responsive

2

evidence. After additional information was provided, the judge made rulings about the admissibility of some of the evidence and then heard arguments on the merits; no live testimony was taken. On November 1, 2019, the judge rendered a written decision explaining his order releasing defendant on level three home supervision without electronic monitoring.

The judge granted the State's application for a stay pending disposition of its motion for leave to appeal. We granted leave to appeal, continued the stay pending our disposition of this appeal, and now reverse.

Defendant, as noted, was charged with first-degree murder at the time of her arrest. During the pendency of this interlocutory appeal, a grand jury indicted defendant and charged her with first-degree murder and the weapons offenses referred to above, as well as a number of hindering and tampering charges.[1] The probable cause finding on the murder charge, and now the indictment, carry a rebuttable presumption in favor of detention because, in that circumstance, the Legislature has assumed that

> no amount of monetary bail, non-monetary condition or combination of monetary bail and conditions would

---

[1] She was charged with: three counts of third-degree hindering apprehension, N.J.S.A. 2C:29-3; third-degree conspiracy to hinder apprehension, N.J.S.A. 2C:29-3; N.J.S.A. 2C:5-2; fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1); and fourth-degree conspiracy to tamper with evidence, N.J.S.A. 2C:28-6(1); N.J.S.A. 2C:5-2.

> reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process[.]
>
> [N.J.S.A. 2A:162-19(b).]

This presumption, however, may be rebutted when a defendant is able to show otherwise by a preponderance of the evidence. N.J.S.A. 2A:162-19(e)(2).

At the detention hearing, the trial judge was presented with: videos obtained from defendant's cellphone; pleadings and other documents revealing a history of domestic violence between defendant and the victim; and recorded interviews of defendant's brother and her eight-year-old daughter. From this information, the judge determined that the victim was "the initial aggressor" and, so, defendant possesses "a viable self-defense claim." In addition, the judge found that whatever danger defendant may have posed to the victim, there is now "little risk of danger as it pertains to any other person or the surrounding community." The trial judge, thus, rejected the public safety assessment, in which defendant scored a 3 (risk of failure to appear) and 4 (risk of new criminal activity), and in which she was flagged for an elevated risk of new violent criminal activity.

In considering the judge's ruling, we start with the premise that appellate courts should not intervene in detention matters absent an abuse of discretion. We must give appropriate deference to the judge's fact findings, even when they are, as here, based "solely on video or documentary evidence" that we can view and assess as well as the trial judge. State v. S.N., 231 N.J. 497, 514-15 (2018) (quoting State v. S.S., 229 N.J. 360, 379 (2017)). Notwithstanding this deferential standard, we may intervene when the judge's decision lacks "factual underpinnings and legal bases supporting [the] exercise of judicial discretion," or rests on: "an impermissible basis"; "irrelevant or inappropriate factors"; a failure "to take into consideration all relevant factors"; "a clear error in judgment"; or a misconception of the applicable law. S.N., 231 N.J. at 515 (quoting State v. C.W., 449 N.J. Super. 231, 255 (App. Div. 2017)).

In making his ruling, the trial judge referred to the "long history of domestic violence," detailing what some of the documentary evidence revealed:

- On November 2, 2017, according to the judge's description of a police report account, the victim allegedly assaulted defendant by "grabbing [her] by the back of her hair, dragging her across the floor," "kick[ing] [her] legs several times and punch[ing] [her] in the mouth with a closed fist." When defendant attempted to call 9-1-1, the victim was alleged to have taken her phone away. Later that evening, defendant received a text message from the victim that he had vandalized

her apartment and responding officers observed "Cop Bitch," "RAT," and "Bitch Cop Caller" spray painted on the apartment walls. The next day, the victim was alleged to have posted defendant's address on Instagram with a similar message. The victim's arrest for the alleged offenses committed over this two-day period did not occur until January 2018; the record does not reveal a reason for the delay.

- On February 10, 2018, a few weeks after the victim's arrest and release regarding the above, he was charged with violating a restraining order by returning to defendant's apartment and destroying household items.

- On March 27, 2018, the victim appeared at defendant's apartment and, according to the judge's findings, which were based on police reports, "yell[ed] profanities, got in [defendant's] face, and threw her shoes in the front yard." Defendant sought and obtained a domestic violence temporary restraining order and, based upon her assertions to a police officer that the victim "punched her multiple times in the area of her upper right shoulder with a closed fist," the officer signed a complaint warrant against the victim for simple assault.

- On April 10, 2018, officers were dispatched to defendant's home. At that time she alleged she was assaulted by the victim two weeks earlier.

- On June 20, 2018, after again being dispatched to defendant's apartment, police officers observed the victim walking away from defendant's vehicle; the four tires had been slashed. The victim was arrested for criminal mischief and

6

harassment. There was also an allegation that he previously broke a window in defendant's apartment.

While the judge found these domestic violence allegations go "directly to the defendant's character and mental state," it is noteworthy that the last of these events occurred fifteen months before the victim was fatally stabbed.

On the other hand, the State offered evidence of a domestic violence incident in May 2019 – a few months before the alleged murder – in which defendant was the aggressor. The victim alleged that defendant sent him twenty-five text messages, including messages such as: "I am going to make you hate me. I am going to make your life a living hell. Watch this shit. Go play with somebody else. You are being calling crying. You and your mother. I get you locked up." The victim filed a complaint; undeterred, defendant responded to him with the following message: "I love when you act tough and disrespectful and shit so I can humble your ass." At the time he filed his complaint, the victim told police officers that defendant is emotionally unstable and has bipolar mental illness. On June 7, 2019, the victim obtained a domestic violence final restraining order against defendant; he dismissed it twelve days later.

As noted, the judge found this history "goes directly to the defendant's character and mental state." Although the judge wasn't more specific about this

A-1419-19T6

determination, we assume he interpreted this history as supporting defendant's self-defense claim even though the last of defendant's domestic violence allegations against the victim occurred more than a year prior to the fatal stabbing. The judge offered no view as to the significance of defendant's far more recent domestic violence directed toward the victim; his opinion suggests he was unimpressed by defendant's more recent act of domestic violence because the victim later obtained a dismissal of the FRO. In fact, all the allegations brought against the victim by defendant had also been dismissed, apparently prior to any adjudication. And the judge made no finding about a letter found by police when searching defendant's car after the alleged murder. In that "to whom it may concern" letter, dated April 11, 2019, defendant acknowledged she had "exaggerated the details" of certain earlier allegations out of anger.

Other than his interpretation of the prior allegations of domestic violence, the judge relied on a series of videos extracted from defendant's phone, which the judge described in the following way:

> Throughout the video the defendant repeatedly asks the victim to leave the home. The victim repeatedly refuses to leave stating he has a right to be there. The argument continues to escalate as defendant instructs her daughter [who was in another room] to lock her door. Both victim and defendant continue to yell, at which point, the defendant walks into the kitchen and states: "Now I have to defend myself." A drawer is opened off

screen and then closed. It is not apparent from the video if anything was taken out of the drawer.[2] [The victim] states: "I'll be in jail? I hit you right? That's what I did, I hit you? Now I am going to hit you." A loud thud is heard and the video abruptly ends. A strike does not appear on screen . . . .

After this description, the judge then drew certain inferences from what was seen and heard. The judge recognized that "[a] strike does not appear on screen," but he concluded

> from [the victim's] statements, the loud thud, the sudden stop of the video, and the mugshot taken at the time of [defendant's] arrest depicting swelling on [her] face, that [the victim] struck [defendant] prior to the stabbing.

The assumption that these videos demonstrate that defendant fatally stabbed the victim while acting in self-defense requires a leap of faith. In fact, that assumption seems belied by what the nine clips plainly reveal.

---

[2] Although it is true that defendant went into the kitchen and opened and closed a drawer, stating "[n]ow I have to defend myself," the preceding argument did not reveal that the victim was any more aggressive than defendant in their verbal argument. If anything, a reasonable viewer of the videos could conclude that defendant was more aggressive during the verbal argument; for example, she appeared to have spat on the victim a couple of times. The judge did not find one way or the other as to whether defendant – when she opened the drawer – had any reason to conclude that she was required to defend herself or arm herself.

A-1419-19T6

The video clip described by the judge in the quote above is two minutes and thirteen seconds in duration. It is true, as the judge determined, that the clip does end in a thud (in the final second or two) and that the victim made the statements the judge attributed to him in the few seconds before that (at 2:07 to 2:13).[3] We defer to those findings. But the judge did not describe the entire video clip and, thus, we need not defer to findings not rendered.

For most of the eighth clip, the verbal argument continues; the participants never raised their voices. For most of the clip, defendant would seem to be seated, as – to her right – the victim compiles his belongings in plastic bags and containers. About twenty to twenty-five seconds before "the thud" (at the 1:45 mark), the victim crosses in front of defendant, as he reaches into the kitchen to her left for a broom and dustpan, which he then uses (from then until about 2:05) to sweep up some material on the floor where he had previously been sitting. During these moments, the victim says something, which we cannot make out, that causes defendant to laugh. As the victim walks back (at about 2:05) to the kitchen with the broom in his right hand and the dustpan in his left, he makes the statements attributed to him about hitting her. See n.5, above. For about

---

[3] The judge found that the victim said, "I'll be in jail? I hit you right? That's what I did, I hit you? Now I am going to hit you."

A-1419-19T6

five seconds before "the thud," as he makes those statements, the victim cannot be seen. In the clip's final one or two seconds, "the thud" occurs as only defendant's left arm and hand, still holding the dustpan, can be seen. It is not inconceivable from what is seen and heard that the victim hit defendant with the broom he had been holding seconds earlier in his right hand.

The trial judge's analysis of these clips requires our deference to the extent it is based on what is revealed by the clips. The assumption the judge draws from these clips is that defendant acted in self-defense in response to whatever produced "the thud." But this assumption is belied by what else is revealed by the collection of clips. The metadata contained in the exhibit demonstrates that the clip containing "the thud" was not the last of the nine clips taken from defendant's phone. It was the eighth. The ninth clip, which is only two seconds long, was captured approximately two minutes after "the thud." Brief as it is, it captures the voices of both. Defendant appears to say, in a normal tone of voice, "all right," the victim then says something not clear to us, and defendant says, still in a normal tone, "all right now you will –," at which point the clip ends. While, in this ninth clip, the victim is again walking from defendant's right to her left (he's no longer holding a broom in one hand and a dustpan in the other;

11

instead, he's holding something small (perhaps a cell phone) in his left hand  and a bottle of water in his right), and defendant is still seated.

Although this ninth clip – that did not factor into the judge's findings – appears insignificant because of its duration, we find it highly important in assessing the viability of defendant's self-defense theory.  As the judge accurately observed, the sense of all the clips is that defendant and the victim were engaged in a verbal argument.  The cause of the thud heard when the eighth clip ends is unclear but, giving the judge deference even though we're able to view the same clips he viewed, see S.N., 231 N.J. at 514-15, we are required to assume, as the judge found, that the victim somehow struck defendant.  We are not, however, required to defer to the judge's ultimate conclusions derived from the factual record when it seems clear the judge did not consider all evidence relevant to the critical issue on which pretrial release was based or did not appreciate the significance of other evidence.  Ibid.

There is nothing in the judge's opinion to suggest that he considered the metadata contained within the clips, which would have strongly suggested that whatever caused "the thud" did not likely cause her to act in self-defense.  A fair reading of the judge's opinion would suggest that he was of a view that there was substance to a contention that the stabbing was a near immediate reaction

12

to whatever caused "the thud." But the ninth clip, even though only two seconds long, shows that after "the thud" the parties were still engaged in the verbal argument, that defendant is still seated, the victim is still walking about, and both are speaking in normal, unheated tones. To conclude that there was a sound basis for assuming defendant acted in self-defense as a reaction to having been struck, as suggested by the trial judge's findings, we would have to ignore the ninth clip.

Even if we could agree that defendant's factual submission suggested a viable theory of self-defense, defendant was still required to overcome the presumption of pretrial detention by showing, by a preponderance of the evidence, that there is no serious risk that: she will not appear in court as required; poses a danger to any other person or the community; or may obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

As to these concerns, the pretrial assessment revealed that defendant, who is twenty-seven years old, has already failed to appear in other criminal proceedings eleven times. She has, as the judge recognized, "one prior violent conviction." As the judge found, defendant had in the past "hindered her own apprehension, provided false reports to law enforcement, and resisted arrest."

 A-1419-19T6

And the judge recognized that defendant, as a juvenile, "assaulted a DCPP caseworker." She was also "flagged" as having "an elevated risk of new violent criminal activity." All of this was given little or no weight by the judge; he explained:

> All the defendant's prior failures to appear result from a period of time, in which, the defendant was involved in a criminal enterprise. The defendant ple[ade]d guilty to the charges and agreed to testify on behalf [of] the State. The defendant took substantial steps to rectify her past wrong doings and assumed the risks that accompanied her previously mentioned actions. In doing so the defendant has displayed a willingness to comply with law enforcement and the court system as a whole.

Although it appears that defendant pleaded guilty and testified for the State in an earlier criminal prosecution, there is nothing else in the record that would support the judge's assertion that defendant "took substantial steps to rectify her past wrongdoings." Indeed, the steps defendant took after fatally stabbing the victim counter any such suggestion.

Defendant makes much of the fact that she drove the victim to the hospital. But she did not stay. She left before the police arrived and then began attempting

to cover up what had occurred by cleaning her home[4] (or engaging others to assist in that regard[5]), disposing of her phone, and being unavailable to police for more than twenty-four hours.

The judge also concluded that defendant is not a flight risk because she is a "lifelong resident of New Jersey." He noted that defendant obtained a degree "to become a medical assistant" and that defendant "believes she can gain employment because of her degree." He did not find that defendant was actually employed.

The evidence amassed reveals significant concerns about defendant's appearance in court when required, the protection of the safety of any other person or the community, and the potential for obstruction or further attempts to obstruct justice. As for the first of these, defendant's eleven failures to appear in the past, her failure to await the police arrival at the hospital, and her elusive

---

[4] Defendant's daughter told police that defendant called a friend and asked whether "she should get rid" of the bloody clothes she was wearing at the time of the stabbing. The daughter also recounted that her mother cleaned the residence with bleach, and later drove her vehicle to a vegetable stand near the woods. From there, defendant used Uber to get around. The child also said that defendant stated "it's all her fault" and that "she knew what she did and wanted to do it." The child later recounted her statement.

[5] A friend of defendant's told police that she called him that day and asked for help in cleaning up the scene.

A-1419-19T6

conduct after the stabbing, present grave concerns about the likelihood of defendant appearing in court when required. On the second aspect, the judge appeared to believe that because defendant's alleged violent tendencies were directed at the victim – and he's now dead – there's no likelihood that defendant poses a risk to others. Even if this were a logical finding based on the materials presented, it disregards defendant's prior record. And the likelihood of an attempt to obstruct seems apparent from defendant's post-stabbing conduct.

Whether we view the evidence from the standpoint of whether defendant overcame the presumption of detention or, if the presumption was overcome, from the standpoint of whether the State clearly and convincingly demonstrated a need for detention, we conclude that the judge abused his discretion in denying the State's motion for pretrial detention.

Reversed. Defendant shall be detained pretrial with the rights accorded under the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1419-19T6